**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MICHAEL S. THUNDERCLOUD,**

    **Petitioner,**

v.

**WARDEN, ROSS CORRECTIONAL INSTITUTION,**

    **Respondent.**

**Case No. 2:20-cv-4747
Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition or a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, and the exhibits of the parties. For the reasons that follow, it is **RECOMMENDED** that this action be **DISMISSED**.

**I.    BACKGROUND**

Petitioner challenges his convictions after a jury trial on kidnapping, felonious assault, and retaliation, with firearm specifications. (*See generally* Doc. 3). The Ohio Fifth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶2} This case arose in October 2017 when Jane Doe was beaten, hog-tied, and terrorized by a group of people at her drug dealer's residence on Grace Avenue in Muskingum County. The following facts are adduced from the record of the trial of co-defendants Thundercloud and Ross.
>
> {¶3} Jane Doe is an admitted chronic illegal drug user. She has had periods of sobriety, but was heavily addicted in October 2017. She lost custody of both of her children. Her husband, the father of the eldest child, died of a drug overdose. "Josh" is the father of her youngest child and is also a long-term drug abuser. Doe has numerous criminal convictions and has frequently violated probation due to "dirty" drug screens.

{¶4} In October 2017, Doe's drugs of choice were heroin and methamphetamine. She would alternate the two, using meth to stay awake and sustain the high from the heroin. Doe freely admits that during this period of her life, she spent all of her time getting high, or finding money to get high, and drugs were her only priority.

{¶5} Her dealer was Darnell Vann, known on the street and referred to at trial as "Smoke." Smoke had a house on Grace Avenue and Doe went there several times a day, every day. The house was usually full of people using heroin, methamphetamine, crack, and cocaine. Sometimes Josh accompanied Doe to Smoke's house to get high. Doe admittedly stole from family members to get money for drugs. Smoke would also give her lists of items to "boost," or steal from stores, which she would exchange for drugs.

{¶6} The instant case relates back to an incident in 2014. In May 2014, Doe was at a house in Crooksville when a drug bust occurred, resulting in the arrest of a dealer named T.J. Murphy. Doe was a witness against Murphy at his ensuing trial. In the wake of the trial, Doe and Josh occasionally heard rumors that Murphy had "put a hit out" on Doe.

{¶7} Life continued to spiral downward for Doe in the fall of 2017. She tested positive for fentanyl abuse and was arrested for receiving stolen property. She violated probation and lost custody of her children yet again. She was hospitalized for six weeks due to a hole in her spleen from chronic drug abuse. Nevertheless, upon her release from the hospital, she immediately sought out Smoke to get high. Doe bounced between living at Smoke's residence and with her parents in their one-bedroom apartment.

{¶8} Once while Doe was at Smoke's, a woman recognized her and told everyone in the house Doe "was the boys," meaning Doe was a police informant. Around this time Doe learned Smoke knew T.J. Murphy and had communicated with him about her whereabouts.

{¶9} Doe still constantly went to Smoke's residence despite Josh's renewed warnings that there was a "hit" out on her. At one point, she talked to Smoke about the threats and he told her there was nothing to worry about. He suggested they could "stage" something where it would appear Doe got "jumped." Everyone would benefit because Murphy would pay Smoke and Doe "would have the target off [her] back." Doe thought the staging sounded like a good idea, but no plan was formulated and Doe told Smoke they would have to discuss it further to figure out the details.

{¶10} On October 27 and 28, 2017, Doe went to Smoke's residence to get high. There were several other people present. Among these were Smoke; Thundercloud, known as "Cherokee;" Ross, known as "Boone;" and Heather

Chandler. Also present was Byron Goodrich, who died of an overdose before trial of the instant case.

{¶11} Doe intended to spend the night at Smoke's because she and Josh had fought. She used drugs and nodded off on the couch in the living room. She awoke to someone punching her in the face. At first Doe thought she was dreaming but became terrified as she realized she was being beaten. She was repeatedly punched and kicked, and was pulled off the couch onto the floor. At first one person was beating her, then it was several people. She felt a foot in her face. She tried to cover herself and urinated on herself as the assault continued. Finally the beating stopped and someone told her to stop screaming.

{¶12} A gun was placed to the back of her head as she lay on the floor, and she was told to crawl into the kitchen on her hands and knees. Doe complied because she had no choice and thought she was going to die. She was crying and in pain from the beating, and heard people talking around her. Some threatened to kill her; someone threatened to take her into the basement to sodomize her. In the kitchen, she was instructed to lay flat with her arms and legs outstretched, and she was hog-tied with a spool of phone cord.

{¶13} Appellee's Exhibit 1 is a cell phone video of the attack as described by Doe. Heather Chandler approaches Doe as she is asleep on the couch, and starts pummeling her. She drags Doe onto the floor and the men join in, kicking Doe. Boone places a gun to the back of Doe's head. Byron Goodrich films the beating and can be heard repeatedly stating, "What a beautiful day. Isn't it a beautiful day?" as Doe screams and the others make threats. Smoke directs the action and instructs Doe to crawl to the kitchen. Cherokee hog-ties her with phone cord. Doe visibly urinates upon herself during the course of the ordeal. The video stops after Doe is hog-tied.

{¶14} Doe didn't know the assault was filmed until afterward. Smoke untied her, gave her clean clothes, and told her to clean herself up. He also gave her some "dope." Doe followed his instructions and didn't leave the house because she was afraid and because she wanted to get high.

{¶15} After the assault, Doe was terrified and in pain. Her face and sides were throbbing, her lips were split, and she could barely speak. Her glasses were broken. She had blood on her clothing. She didn't call the police or seek medical attention because, as she testified, she learned her lesson about talking. Doe unequivocally testified that she did not agree to be assaulted or terrorized during this incident, nor did she plan to be. She was hurt and terrified throughout the assault and was not acting. She still suffers from ongoing nightmares and constant fear.

{¶16} Despite Doe's failure to report the incident, eventually police sought her out. Police executed a search warrant on Byron Goodrich's cell phone in an

unrelated case and found the video of the assault. Officers recognized the interior of Smoke's residence and some of the people on the video. Police tracked down Doe to find out what happened. During the course of the investigation, Doe was threatened repeatedly and police "put her somewhere safe," but she willingly left the safe place to get high.

{¶17} Smoke and Chandler testified for appellee as part of plea bargains in their own cases. Their versions of the attack largely matched Doe's and filled in additional details.

{¶18} Smoke learned Doe "snitched" against Murphy and spoke to Murphy about Doe's whereabouts. Murphy told him to beat Doe. Smoke intended to comply with Murphy's request to get paid. He planned to make a fake video because he didn't want Doe to get seriously hurt. He thus intended to have a female "jump" Doe and to film the assault to show to Murphy. Smoke acknowledged he mentioned this plan to Doe a few weeks prior to the assault; Doe said she was interested but they would need to discuss it in greater detail.

{¶19} On October 27, Heather Chandler came to his residence to do Smoke's hair and to get high. Present in the basement with Smoke and Chandler were Goodrich, "Boone," and "Cherokee;" all were present when Smoke suggested to Chandler that she should beat Doe. According to Smoke, everyone else was "supposed to sit back." Chandler testified, though, that when Smoke held out a bag of "dope" as payment for the attack, everyone ran for the stairs, eager to get in on the beating to score drugs from Smoke.

{¶20} Chandler observed Doe asleep on the couch and started beating her. At first Smoke was filming, then Goodrich. Chandler dragged Doe off the couch and kicked her, and Goodrich and Cherokee joined in. Boone put a gun to the back of Doe's head. The group forced Doe to crawl into the kitchen, and Cherokee hog-tied her with a spool of phone cord. Boone kept a gun to her head the entire time. Smoke also had a gun in his hand at one point.

{¶21} Smoke testified that using guns had not been planned ahead of time and the assault spiraled out of control when the entire group got involved. He testified Doe's face was "beat up;" it was swollen and her lips were "busted." She was scared, crying, and begging them to stop. Smoke acknowledged someone suggested they should stab her in the head, and someone else said they should sodomize her.

{¶22} Smoke further testified that once the camera was turned off, Boone and Goodrich wanted to take Doe into the basement and kill her because she was a snitch. Smoke thought killing her was a bad idea because there were too many people in the house who knew about the assault. Smoke untied Doe and told her to clean herself up. He gave her clean clothes and some heroin.

4

{¶23} Smoke called Murphy and told him the assault was accomplished, but complained Murphy never paid him.

{¶24} Smoke testified Doe did not agree to the assault, was not aware it was going to happen, and did not consent to anything that occurred. He said that at first, he was "staging" the assault to look good on camera, but events were out of his control when everyone else got involved.

{¶25} Chandler testified that while she was beating Doe, she "blacked out" and didn't recall everything she did to Doe until she saw the video. Chandler acknowledged that she beat Doe with full force and was not "hitting her easy." Chandler also confirmed Boone wanted to kill Doe and Smoke tried to calm him down.

{¶26} After the beating of Doe, Smoke and Goodrich also beat up Josh while Doe sat by, crying. Goodrich pulled a gun on Josh and Smoke told him to beat Josh but not to kill him. Smoke acknowledged Josh was present weeks before when he discussed staging an assault with Doe, but Josh didn't think it was a good idea and didn't want any part of it.

{¶27} Despite the beatings at Smoke's residence, Doe and Josh continued to return regularly to get high.

{¶28} Thundercloud ("Cherokee") and Ross ("Boone") were indicted as follows: Count I, kidnapping pursuant to R.C. 2905.01(A)(3), a felony of the first degree; Count II, aggravated robbery with a firearm specification pursuant to R.C. 2911.01(A)(1), a felony of the first degree; Count III, felonious assault with a firearm specification pursuant to R.C. 2903.11(A)(1), a felony of the second degree; Count IV, retaliation with a firearm specification pursuant to R.C. 2921.05(A), a felony of the third degree; and Count V, kidnapping with a firearm specification pursuant to R.C. 2905.01(A)(2), a felony of the first degree. The firearm specifications are pursuant to R.C. 2941.145.

{¶29} Prior to trial by jury, appellee sought and was granted leave to nolle Counts II and V, including the firearm specifications. The trial court then re-numbered the counts for purposes of sentencing. Count I remained Count I, but Count II became felonious assault with a firearm specification pursuant to R.C. 2903.11(A)(1), a felony of the second degree (formerly Count III); Count III became retaliation with a firearm specification pursuant to R.C. 2921.05(A), a felony of the third degree (formerly Count IV).

{¶30} The matter proceeded to trial by jury. Both Thundercloud and Ross moved for judgment of acquittal pursuant to Crim.R. 29(A) upon the count of felonious assault, asserting appellee presented insufficient evidence of serious physical harm. The motions were overruled.

{¶31} Thundercloud was thereupon found guilty as charged. The trial court sentenced Thundercloud to an aggregate prison term of 20 years.

{¶32} Thundercloud now appeals from the trial court's judgment entry of conviction dated June 12, 2018.

{¶33} Thundercloud raises two assignments of error:

{¶34} "I. The trial court erred in denying Michael Thundercloud's Motion for Acquittal and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him of felonious assault."

{¶35} "II. The trial court failed to merge allied offenses of similar import and thus imposed more prison terms than authorized by law."

*State v. Thundercloud,* 5th Dist. No. CT2018-0048, 2019 WL 2564122 at *1–4 (Ohio Ct. App. June 20, 2019). On June 20, 2019, the appellate court affirmed the trial court's judgment. *Id.* On January 21, 2020, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Thundercloud*, 157 Ohio St.3d 1538 (Ohio 2020).

On September 15, 2020, Petitioner filed this pro se habeas corpus petition. (Doc. 4). He asserts that the trial court unconstitutionally denied his motion for judgment of acquittal (claim one); and that his convictions constitute allied offenses of similar import (claim two). (*Id.*). It is Respondent's position that Petitioner's claims are procedurally defaulted and without merit.

## II. PROCEDURAL DEFAULT

### A. Standard

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b)–(c).

6

If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. *Id*.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. *Id*.  As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986);

7

*see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. *Maupin,* 785 F.2d at 138. Second, the court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id*.

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)). That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). Or, if procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the

8

ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." *Id*., at 848 (quoting *id*., at 853 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id*., at 848. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].'" *Id*., at 854 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

### B. Application

In claim one, Petitioner asserts that the trial court unconstitutionally denied his motion for judgment of acquittal or, liberally construing this claim, he asserts that the evidence is

9

constitutionally insufficient to sustain his convictions. Petitioner raised this same claim on direct appeal; however, he failed thereafter to raise the same issue in the Ohio Supreme Court. (*See* Doc. 9, PAGEID # 158–59). Further, he may no longer do so under Ohio's doctrine of *res judicata*. "It is well-settled that '[c]laims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of res judicata.'" *Teitelbaum v. Turner*, No. 2:17-cv-583, 2018 WL 2046456, at *15 (S.D. Ohio May 2, 2018) (quoting *Hill v. Mitchell*, No. 1:98-cv-452, 2006 WL 2807017, at *43 (S.D. Ohio Sept. 27, 2006)) (citing *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967)). Petitioner violated the *res judicata* rule set forth in *Perry* when he failed to raise his claims on direct appeal, and, consequently, the first prong of the *Maupin* test is satisfied.

Moreover, Ohio courts have consistently relied upon the doctrine of *res judicata* to refuse to review the merits of procedurally barred claims. *See, e.g.*, *State v. Cole*, 2 Ohio St.3d 112 (1982). The Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *See, e.g.*, *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998).

Turning to *Maupin*'s independence prong, under the circumstances presented here, Ohio's doctrine of *res judicata* does not rely on or otherwise implicate federal law. Accordingly, the undersigned finds that the first three *Maupin* factors are satisfied.

In claim two, Petitioner asserts that his convictions constitute allied offenses of similar import. The appellate court reviewed this claim for plain error only, because Petitioner failed to object:

{¶47} Thundercloud argues that the offenses of retaliation and felonious assault were allied offenses of similar import which should have merged for purposes of sentencing. We disagree.

{¶48} A defendant may be indicted upon and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. *State v. Carr*, 2016-Ohio-9, 57 N.E.3d 262, ¶ 42 (5th Dist.), citing *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 42. R.C. 2941.25 states as follows:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶49} The question of whether offenses merge for sentencing depends upon the subjective facts of the case in addition to the elements of the offenses charged. *State v. Hughes*, 5th Dist. Coshocton No. 15CA0008, 2016-Ohio-880, 60 N.E.3d 765, ¶ 21. In a plurality opinion, the Ohio Supreme Court modified the test for determining whether offenses are allied offenses of similar import. *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. The Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. *Id.* at ¶ 48. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. *Id.* at ¶ 49. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. *Id*. at ¶ 50. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge. *Id.* at ¶ 51.

{¶50} *Johnson's* rationale has been described by the Court as "incomplete." *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 11. The Court has further instructed us to ask three questions when a defendant's conduct supports multiple offenses: (1) were the offenses dissimilar in import or significance? (2) were they committed separately? and (3) were they committed with separate animus or motivation? *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. An affirmative answer to any of the above will permit separate convictions. *Id*. The conduct, the animus, and the import must all be considered. *Id.*

11

{¶51} Appellate review of an allied-offense question is de novo. *State v. Miku*, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 70 (5th Dist.), citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 12. In the instant case, however, Thundercloud did not seek merger at trial. By failing to seek the merger of convictions as allied offenses of similar import in the trial court, a defendant forfeits his or her allied offenses claim for appellate review, except for plain error. *See State v. Rogers,* 143 Ohio St.3d 385, 2015–Ohio–2459, 38 N.E.3d 860, ¶ 21. In *Rogers*, the Court reaffirmed that even if an accused shows the trial court committed plain error affecting the outcome of the proceeding, the appellate court is not required to correct it. *Id*. at ¶ 23. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph 3 of the syllabus.

{¶52} We find felonious assault and retaliation cannot be construed to be allied offenses of similar import. The word "import" in the context of allied offenses refers to "offenses of similar importance, consequence and signification." *State v. Baer,* 67 Ohio St.2d 220, 226, 423 N.E.2d 432 (1981). As noted supra, felonious assault pursuant to R.C. 2903.11(A)(1) requires proof that the defendant knowingly caused serious physical harm to another. Retaliation, R.C. 2921.05(A), states "[n]o person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a * * * witness who was involved in a * * * criminal action or proceeding because the * * * witness discharged the duties of the * * * witness."

{¶53} Fundamentally, these offenses do not pass even the first level of the *Johnson test, supra*. 2010-Ohio-6314 at ¶ 48. In *State v. Phillips*, 8th Dist. Cuyahoga No. 79192, 2001 WL 1612103, at *6, the Eighth District considered whether these are allied offenses of similar import:

> Regardless of whether we make our determination based upon an abstract comparison of the implicated statutes, or a specific review and comparison of the facts of this case as they apply to the statutes, we conclude retaliation and felonious assault are not allied offenses. As the State plainly argued in its appellate brief, one may commit a felonious assault without the animus to retaliate against the victim; and one may retaliate without causing or attempting to cause serious physical harm as required by felonious assault.

{¶54} *See also, State v. Calhoun*, 8th Dist. Cuyahoga No. 91328, 2009-Ohio-2361, ¶ 27. Even if we were to find that the offenses can be allied offenses of similar import under certain circumstances, they are not allied offenses in the instant case. Thundercloud committed retaliation hoping to get paid in dope; he participated in and was complicit to the ensuing felonious assault.

12

> {¶55} The trial court did not commit plain error in failing to merge the offenses of retaliation and felonious assault. Thundercloud's second assignment of error is overruled.

*Thundercloud*, 2019 WL 2564122, at *6–8.

Petitioner thereby has procedurally defaulted claim two. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Norton v. Sloan*, No. 1:16-cv-854, 2017 WL 525561, at *12 (N.D. Ohio Feb. 9, 2017) (citing *Durr v. McLaren*, No. 15-1346, 2015 WL 5101751, at *2 (6th Cir. Aug. 28, 2015)). The United States Court of Appeals for the Sixth Circuit has held that Ohio's contemporaneous-objection rule constitutes an adequate and independent state ground to preclude federal habeas review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334-35 (6th Cir.) (citation omitted), *cert. denied sub nom. Wogenstahl v. Robinson*, 568 U.S. 902 (2012); *Awkal v. Mitchell*, 613 F.3d 629, 648–49 (6th Cir. 2010), *cert. denied*, 562 U.S. 1183 (2011). Importantly, the state appellate court's plain error review does not constitute a waiver of the state's procedural default rules. *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006), *cert. denied sub nom. Keith v. Houk*, 549 U.S. 1308 (2007). Further, any alternative ruling on the merits does not remove the procedural default. *See Conley v. Warden, Chillicothe Corr. Inst.*, 505 F. App'x 501, 506 (6th Cir. 2012) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)).

Petitioner may still obtain review of this claim on the merits if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violation.

> "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003). Constitutionally ineffective assistance of counsel may constitute cause for a procedural default, so long as the claim has been presented to

13

the state courts and is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986)).  Here, Petitioner did not raise a claim of ineffective assistance of counsel in the Ohio courts.  Further, ineffective assistance of counsel cannot constitute cause in the filing of an appeal in the Ohio Supreme Court, where there is no constitutional right to counsel in those proceedings.  *See Gulertekin v. Tinnelman–Cooper,* 340 F.3d 415, 425 (6th Cir.2003) (citing *Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("[T]he right to counsel extends to the first appeal of right, and no further."); *Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005)).  Petitioner has failed to establish cause for his procedural defaults.

Moreover, Petitioner does not allege, and the record does not reflect, that this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[,]" *Murray v. Carrier*, 477 U.S. at 491, such that the Court may nonetheless consider the merits of Petitioner's procedurally defaulted claims.  *See also Sawyer v. Whitley*, 505 U.S. 333 (1992).

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. Thus, the threshold inquiry is whether "new facts raise [ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321.

*Souter v. Jones*, 395 F.3d 577, 589–90 (6th Cir. 2005). Petitioner does not meet this standard here.

### III. DISPOSITION

Therefore, it is **RECOMMENDED** that this action be **DISMISSED.**

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED**.

Date: March 16, 2021  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE